

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00645-CV

———————————————

IN THE INTEREST OF A.S., A CHILD

---

On Appeal from the 90th District Court
Young County, Texas
Trial Court No. 33125

---

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellee Mother filed a petition to terminate Appellant Father's parental rights to their child, A.S.[1] Following a bench trial, the trial court signed an order terminating Father's parental rights. In this ultra-accelerated appeal,[2] Father contends in two issues that the evidence is legally and factually insufficient to support (1) the trial court's Section 161.001(b)(1)(F) finding that he failed to support A.S. in accordance with his ability during a one-year period ending within six months of the date that the petition was filed and (2) the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F), (2). We will affirm.

## I. BACKGROUND

Although they never married, Mother and Father had a child, A.S., together. Before A.S. turned two years old, Mother and Father broke up and began living in separate cities. Currently, Father lives in Magnolia, Texas, with his fiancée, and Mother lives near her family in Graham, Texas.

In 2021, Mother and Father obtained a court order setting forth their rights and responsibilities regarding A.S. As amended in 2022, this order provided that Mother

---

[1]We refer to the child by her initials and to other family members by their relationship to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

and Father were A.S.'s joint managing conservators and that Mother had the exclusive right to designate A.S.'s primary residence in Graham. Under the order's possession schedule, Father had the right to possess A.S. two weekends per month, one of which must be spent in Graham. Father was also required to pay Mother $500 per month in child support.

In June 2023, Mother filed a petition to modify the parent–child relationship in which she asked the trial court to suspend Father's possession rights pending a mental-health evaluation and to allow Father only supervised visits following the evaluation's completion. In August 2023, Father filed a counterpetition requesting a decrease in his child-support obligation. In September 2023, the parties entered into a Rule 11 agreement requiring Mother and Father to undergo psychological evaluations and suspending Father's in-person access to A.S. pending the results of his mental-health evaluation. A.S. has not seen Father in person since that time.

In February 2025, Mother amended her petition to include a request to terminate Father's parental rights to A.S.

In November 2025, the trial court conducted a bench trial on the parties' petitions, including Mother's petition to terminate Father's parental rights. Following the trial, the trial court found by clear and convincing evidence that Father had failed to support A.S. in accordance with his ability during a period of one year ending within six months of the date that Mother had filed her termination petition and that the termination of Father's parental rights was in A.S.'s best interest. *See* Tex. Fam.

Code Ann. § 161.001(b)(1)(F), (2). Based on these findings, the trial court signed an order terminating Father's parental rights. At Father's request, the trial court issued findings of fact and conclusions of law. This appeal followed.

## II. Discussion

### A. Applicable Law and Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). In a termination case, the petitioner seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.

4

Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen [a party] seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *E.R.*, 385 S.W.3d at 554 (citing *Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1391–92). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *E.N.C.*, 384 S.W.3d at 802; *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the petitioner proved one or more of the conduct-specific grounds on which the termination was based and that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both a Subsection (b)(1) predicate ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Factors that the trier of fact in a termination case may also use in determining the best interest of the child include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available

6

to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.*

## B. Sufficient Evidence Supports the Subsection (F) Predicate-Ground Finding

In his first issue, Father contends that the trial court's Subsection (F) predicate-ground finding is supported by legally and factually insufficient evidence. We disagree.

"A trial court may terminate a parent's rights under [S]ubsection (F) if it finds, by clear and convincing evidence, that the parent failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition." *In re I.M.S.*, 679 S.W.3d 704, 716 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (citing Tex. Fam. Code Ann. § 161.001(b)(1)(F)). "One year" means twelve consecutive months. *Id.* Because the

one-year period must *end* within six months of the date that the termination petition was filed, logically, it must *begin* no earlier than eighteen months before that date. *See In re J.G.S.*, 574 S.W.3d 101, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *see also In re F.E.N.*, 542 S.W.3d 752, 765 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (concluding that relevant time period under Subsection (F) was "any twelve consecutive months" between September 1, 2011, and March 1, 2013, which was date termination petition was filed), *pet. denied*, 579 S.W.3d 74 (Tex. 2019) (per curiam).

The party seeking termination bears the burden to establish that the parent had the ability to support the child during each month of the twelve-month period. *In re Z.W.C.*, 856 S.W.2d 281, 282–83 (Tex. App.—Fort Worth 1993, no writ); *accord J.G.S.*, 574 S.W.3d at 117; *In re E.M.E.*, 234 S.W.3d 71, 72 (Tex. App.—El Paso 2007, no pet.); *In re T.B.D.*, 223 S.W.3d 515, 518 (Tex. App.—Amarillo 2006, no pet.). A previous child-support order is not evidence of a parent's ability to pay under Subsection (F). *In re D.M.D.*, 363 S.W.3d 916, 920 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *In re D.S.P.*, 210 S.W.3d 776, 781 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.) (concluding that child-support order "should not be afforded any relevance in a termination proceeding involving [Subsection (F)]"). Without clear and convincing evidence of the parent's ability to support the child during the statutory period, the trial court may not order termination under Subsection (F). *J.G.S.*, 574 S.W.3d at 117.

Father argues that the evidence is insufficient to support the trial court's Subsection (F) finding because he testified that in 2024[3] he earned an amount roughly equal to the yearly earnings of a full-time minimum-wage worker and because he made child-support payments of "around $200[] per month," an amount approximating what such a full-time minimum-wage earner with two children would be required to pay under the current child-support guidelines.[4] *See* Tex. Fam. Code Ann. § 154.125. This argument is flawed on multiple levels. First, Father testified that in 2024 he earned between $20,000 and $26,000,[5] an amount far exceeding a full-time minimum-wage income. *See Vanderbol v. Vanderbol*, No. 02-23-00230-CV, 2024 WL 1925141, at *3 (Tex. App.—Fort Worth May 2, 2024, pet. denied) (mem. op.) (calculating that a worker earning "the federal minimum wage for a 40-hour week" would earn "approximately $15,080 per year" (citations omitted)). Second, Father did not make child-support payments of "around $200[] per month" in 2024; rather, he paid only $1,000 for the entire year—that is, approximately $83 per month.

---

[3]Because Mother filed her termination petition in February 2025, the twelve-month period beginning in January 2024 and ending in December 2024 falls within Subsection (F)'s parameters. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F); *J.G.S.*, 574 S.W.3d at 117.

[4]Father has another child with a different mother, and he has separate child-support obligations to her. Thus, at the time of trial, he had the duty to support two children.

[5]Father testified that he earned $15,000 to $20,000 in 2023 and that he earned "[m]aybe five or six grand more" in 2024.

And reviewing the record as a whole, we conclude that there is ample evidence to support the trial court's Subsection (F) predicate-ground finding. Indeed, Father explicitly admitted that he could have paid more in support than he actually did in 2024.[6] This admission alone constitutes sufficient evidence that he failed to support A.S. in accordance with his ability during the relevant time period. *Cf. In re T.L.R.*, No. 02-12-00004-CV, 2012 WL 4010402, at *4 (Tex. App.—Fort Worth Sept. 13, 2012, no pet.) (mem. op.) (holding that "appellant's explicit admissions that he [had] failed to complete certain aspects of the service plan" constituted legally and factually sufficient evidence to support the jury's predicate-ground finding under former Subsection (O)); *In re E.V.*, No. 04-05-00620-CV, 2005 WL 3297029, at *1 (Tex. App.—San Antonio Dec. 7, 2005, no pet.) (mem. op.) (same). Additionally, Father testified that he has minimal monthly expenses because his fiancée pays all of their bills, including rent, electricity, gas, and water, and acknowledged that "each and every month" of 2024 he paid $600—an amount exceeding his child-support obligation for A.S.—to lease a trailer to haul motorcycles and equipment before "voluntar[il]y

---

[6]In his brief, Father asserts that "this was a general statement" and that "there is no evidence about the relevant time period" to which he was referring when he testified that he could have paid more in child support than he actually paid. But the record belies this assertion. During cross-examination, Mother's counsel specifically asked Father whether he "could have paid more than" the "total of 1,000 big dollars [that he paid] for the entire year of 2024," and Father answered in the affirmative.

return[ing]" it to the lessor in January 2025.[7] He also agreed that because he is a mechanic and has worked in the oil field, he could find a better-paying job if he wanted one. *See In re D.S.P.*, 210 S.W.3d 776, 782 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.) (recognizing that a finding that a parent's "inability to pay [was] the result of the parent's conscious choice" could support termination on Subsection (F) grounds but concluding that, based upon the record in that particular case, appellees had failed to present evidence showing that "appellant's inability to support [was] the result of her own doing"); *cf. In re W.C.S.*, No. 04-21-00269-CV, 2022 WL 2821076, at *2 (Tex. App.—San Antonio July 20, 2022, no pet.) (mem. op.) ("[A] court may take a parent's earning potential into account when determining the amount of child support the parent must pay." (quoting *In re M.A.G.*, No. 04-01-00347-CV, 2002 WL 501657, at *3 (Tex. App.—San Antonio Apr. 3, 2002, no pet.) (not designated for publication))).

Considering all of the evidence discussed above and the remainder of the record, we conclude that the trial court reasonably could have formed a firm belief or conviction that Father failed to support A.S. in accordance with his ability during the relevant time period. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F). Accordingly, the

---

[7]Father claimed that this $600 per month lease obligation was a business expense because he "was trying to grow [his motorcycle-repair] business" by attending motocross events. But he also testified that he rode in motocross events "for fun" as a "hobby" and that he used the trailer at events that he rode in.

evidence is factually sufficient to support the trial court's Subsection (F) predicate-ground finding.[8] *See C.H.*, 89 S.W.3d at 18–19.

We overrule Father's first issue.

## C. Sufficient Evidence Supports the Trial Court's Best-Interest Finding

In his second issue, Father contends that the evidence is legally and factually insufficient to support the trial court's best-interest finding. Again, we disagree.

The record reflects that A.S. does not want to visit Father or even to speak with him on the phone, a factor that weighs in favor of the trial court's best-interest finding. *See Holley*, 544 S.W.2d at 371–72. As early as 2023, A.S. began jumping in the back seat of Mother's car to hide from Father when he came to pick her up for his possession time. When A.S. went to visit Father during spring break of that same year, Father left A.S. with some people that she did not know while he went to work. This made A.S. uncomfortable, and she FaceTimed Mother "bawling and crying" to tell her that she wanted to come home and that "[s]he didn't want to be there anymore." Since then, A.S. has generally refused to answer Father's calls and has explained to her psychologist that she does not want to talk to Father because she does not feel like he "puts out any effort," so she is not going to do so either. According to A.S.'s maternal grandmother, A.S. constantly refuses to take Father's phone calls and becomes mean

---

[8]Because we conclude that the evidence is factually sufficient, we necessarily conclude that it is also legally sufficient. *See S.B. v. Tex. Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 252 & n.2 (Tex. App.—Austin 2022, pets. denied).

and anxious when she is encouraged to answer them. A.S. also told her psychologist that she does not like going to Father's house because he would frequently fight with his fiancée and would not enforce certain rules that A.S. knew Mother wanted her to follow.[9]

Further, the record reflects that A.S.'s visits to Father's home generally had a negative emotional impact on her. Her first-grade teacher testified that after visiting Father, A.S. was often distracted, tired, grumpy, and struggled to get her schoolwork done. According to the teacher, A.S. "wasn't her same [self]" when she returned from her visits with Father; she did not relate to her peers the same way and was more isolated. A.S.'s maternal grandmother also testified that A.S. suffered emotionally from her visits with Father and that she "didn't come back as our grandchild." According to her grandmother, A.S. would be "agitated, very, very stressed out," and "short" with family members, and she would often "act out" after returning from these visits. A.S. also began wetting the bed when she returned from visits with Father and needed therapy to help her deal with this issue.

---

[9]Father makes much of the fact that A.S.'s psychologist testified that the child kept going "back and forth" about whether she liked going to Father's house for visits. But this mischaracterizes the psychologist's testimony. Although he stated that A.S. was going back and forth for a while, he went on to explain that the home environment at Father's house "progressively got worse to where it seemed like there was more fighting there and then less rule following, and then that's where [A.S.] really started getting more vocal about not wanting to go."

But the record reflects that A.S. has been thriving overall since she stopped visiting Father. A.S.'s maternal grandmother testified that A.S. is "great" now that she is not going to Father's home for visits; she is not stressed out, makes good grades, and is a happy child. A.S.'s current teacher confirmed that A.S. is "doing great" in school and is "a happy kid." *See In re L.C.*, No. 02-24-00510-CV, 2025 WL 1774759, at *4 (Tex. App.—Fort Worth June 26, 2025, pet. denied) (mem. op.) (holding that the fact that the child was "flourishing in her current environment" supported trial court's best-interest finding); *see also In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *6 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.) (considering evidence that children were doing well in foster placements in best interest analysis). Additionally, Mother has a strong family-support system and is taking good care of A.S. *See L.C.*, 2025 WL 1774759, at *4 (holding that the fact that appellee mother had "good parenting skills and [was] taking good care of the child" supported the trial court's best-interest finding); *In re J.G.S.*, 550 S.W.3d 698, 705 (Tex. App.—El Paso 2018, no pet.) (concluding that the fact that the child was "well-cared for by her aunt and uncle" and was "doing well in her placement" supported the trial court's finding that termination was in the child's best interest); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (considering the fact that child was being well cared for by foster parents as a factor in best-interest determination).

Father claims that he "had a strong relationship" with A.S. and emphasizes that Mother agreed that A.S. "appeared to be happy and smiling" in certain pictures taken with Father. But given the overwhelming evidence that A.S. does not want to visit—or even talk to—Father, that her visits with Father had a negative emotional impact on her, and that she has been flourishing since the visits stopped, we cannot conclude that Father's personal view regarding the strength of his past relationship with A.S. (before he stopped seeing her) and anecdotal evidence that A.S. looked happy in a few pictures taken with him would preclude a factfinder from forming a firm conviction or belief that the termination of Father's parental rights was in A.S.'s best interest. *See C.H.*, 89 S.W.3d at 18–19.

Father also claims that he "is able to provide [A.S.] a safe and stable living environment" because he got engaged to his current fiancée in 2019 and "has lived with her, other than a few months in 2023, since then." But because Father depends on his fiancée to cover all his living expenses and is not on the lease to their home, his living situation is not as stable as he claims.[10] *Cf. In re M.G.*, No. 02-23-00074-CV, 2023 WL 4008687, at *6 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem. op.) (holding that because mother lived with father but was not married to him and was not named on the apartment lease, "her living situation was subject to [f]ather's

---

[10]When asked at trial "how [he] would . . . get by on a monthly basis" if something suddenly happened to his fiancée, Father was unable to offer any semblance of a plan and instead vaguely stated that he would "figure out a way to make it work."

whims—and was thus unstable"); *In re A.R.B.*, No. 14-14-00146-CV, 2014 WL 2936925, at *13 (Tex. App.—Houston [14th Dist.] June 26, 2014, no pet.) (mem. op.) (holding that father had failed to comply with his service plan's requirement that he find stable housing because he lived with his fiancée but was not on the lease and "admitted that if he and [his] fiancée broke up, he would have to depend on family and friends for support"). Further, the record reflects that Father's relationship with his fiancée is somewhat volatile and that they frequently fought during A.S.'s visits, causing her significant emotional distress. Indeed, they have already broken up once—for a period of approximately six months—and Father has had to leave the home several times after fighting with his fiancée, including at least one time when A.S. was visiting.

Considering all of the evidence discussed above and the remainder of the record, we conclude that the trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in A.S.'s best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19.

We overrule Father's second issue.

### III. CONCLUSION

Having overruled both of Father's issues, we affirm the trial court's termination order.

16

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: April 16, 2026